IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LUANESHA ALEXANDER,                )
                                   )
            Plaintiff,             )
                                   )
      v.                           )
                                   )            1:11CV725
DIVERSIFIED ACE SERVICES II,       )
AJV, ACE SERVICES, INC.,           )
DIVERSIFIED SERVICE                )
CONTRACTING, INC.,                 )
STEVEN MALONE, and NED GODWIN,     )
                                   )
            Defendants.            )

<u>MEMORANDUM OPINION AND ORDER</u>

BEATY, District Judge.

        This matter is before the Court on a Motion to Dismiss [Doc. #32] filed by Defendant

Steven Malone ("Defendant Malone") and a Partial Motion to Dismiss [Doc. #33] filed by

Defendants Diversified Ace Services II, AJV ("DAS II"), Diversified Service Contracting, Inc.

("Diversified Service Contracting"), Ace Services, Inc. ("Ace Services"), and Ned Godwin

("Defendant Godwin") (collectively "Corporate Defendants and Defendant Godwin").  The

Motions have been fully briefed and are properly before the Court for review.  For the reasons

discussed below, the Court will grant in part and deny in part Defendant Malone's Motion to

Dismiss [Doc. #32] and grant in part and deny in part Corporate Defendants and Defendant

Godwin's Partial Motion to Dismiss [Doc. #33].

## I.    FACTUAL BACKGROUND

The factual allegations of Plaintiff Luanesha Alexander's ("Plaintiff") Amended Complaint, taken as true for purposes of Defendants' Motions to Dismiss, allege that Plaintiff was hired by DAS II's predecessor company in 2005. Then when DAS II became the housekeeping contractor for the Environmental Protection Agency's Durham office in 2007, Plaintiff was told she became an employee of DAS II.[1] DAS II is "an assumed name of certain corporations and the joint ventures created between [Diversified Service Contracting and Ace Services]" and "is an alter-ego of [these] two corporations." (Am. Compl. [Doc. #30] ¶¶ 4, 5.)[2] Defendant Godwin was a manager for DAS II who had the authority to supervise both Plaintiff and Plaintiff's supervisor, Deborah Hunter ("Supervisor Hunter"). Defendant Malone "owns and/or manages" DAS II and "one or more of its parent companies." (Am. Compl. [Doc. #30] ¶ 11.)

Plaintiff alleges that Defendant Godwin began sexually harassing and threatening her in 2008. The first incident occurred in October 2008, when Defendant Godwin told Plaintiff that he needed to show her a new cleaning site, and told her to pick up her cleaning supplies from a hotel in Chapel Hill, North Carolina. Then when she arrived at this hotel room where Defendant Godwin told her they would be picking up the supplies, he "forced her into the hotel

---

[1] Throughout Plaintiff's Amended Complaint [Doc. #30], she collectively refers to DAS II, Diversified Service Contracting, and Ace Services as "DAS" or "Defendants DAS." This Opinion instead refers to these three parties collectively as "Corporate Defendants."

[2] Corporate Defendants and Defendant Godwin admit that DAS II is "a joint venture recognized by the United States government between two North Carolina corporations: Diversified Service Contracting[ ] and Ace Services[ ]." (Answer [Doc. #31] ¶ 4.)

room, prevented her from leaving, and sexually assaulted her." (Am. Compl. [Doc. #30] ¶ 21.) For the rest of the time Plaintiff worked at DAS II, Defendant Godwin continually threatened her, telling her that he "would have her fired instantly if she ever told anyone about his actions," that he was "good friends" with Supervisor Hunter and all of the managers, and that "if [Plaintiff] told anyone about his actions, he would know about it and she would be fired." (Am. Compl. [Doc. #30] ¶¶ 22-23.) Defendant Godwin also told her that she should "give up" and "have sex with him," that sex with him "was inevitable," that "she could not stop him," and that "she would be punished if she did not give in." (Am. Compl. [Doc. #30] ¶¶ 22, 25.) Plaintiff was afraid of Defendant Godwin and believed his threats.

On an occasion when Plaintiff was working on June 8, 2010, Defendant Godwin pushed her into a supply closet with him while pulling condoms from his pocket and told her that "this is it." (Am. Compl. [Doc. #30] ¶ 28.) Defendant Godwin "grabbed [Plaintiff's] groin and breasts[, ]attempted to get his hands into her clothes[,] and told her that she [ ] 'had to give up' and that she was going to 'be with a black man today.'" (Am. Compl. [Doc. #30] ¶ 28.) Plaintiff fought Defendant Godwin off and escaped from the closet. Afterwards, the threats continued by way of Defendant Godwin looking for mistakes Plaintiff was making in her job and telling her she needed to decide "whether she was going to give in to him or lose her job." (Am. Compl. [Doc. #30] ¶¶ 30, 31.)

On July 28, 2010, Plaintiff requested and received permission from Supervisor Hunter to leave for lunch an hour later than scheduled. Upon return, Defendant Godwin told her that she violated company policy by leaving for lunch at a time other than her scheduled lunch break,

and he was therefore suspending her. (Am. Compl. [Doc. #30] ¶ 34.) Plaintiff was upset and sought help from her husband, who attempted to call DAS II's human resources department, but instead reached Defendant Malone. Defendant Malone told Plaintiff's husband that he would look into the matter and call them back. When Defendant Malone called back, he spoke to Plaintiff, telling her that he spoke with Defendant Godwin and that Plaintiff's suspension would continue. Plaintiff then "broke down" and told Defendant Malone about Defendant Godwin's harassment, "especially Godwin's threats to take away her job if she refused to have sex with him." (Am. Compl. [Doc. #30] ¶ 38.)

Defendant Malone told Plaintiff not to come in until July 31, 2010, at which point, Defendant Malone would meet her at work or send someone to meet her for her protection. Before returning to work, Plaintiff tried to seek advice from EPA Project Manager Al Little, who was in charge of EPA contractors, including DAS II. Plaintiff believed Mr. Little could tell her who she could report to without putting herself in danger with Defendant Godwin. Mr. Little told Plaintiff to meet him at the EPA office so they could talk, but when she arrived at his office, she was intercepted by Defendant Godwin, who yelled threats at her and physically prevented her from going into Mr. Little's office.

Plaintiff then went to work on July 31 as instructed and waited in the office for Defendant Malone. Supervisor Hunter told Plaintiff that Defendant Godwin changed Plaintiff's assigned area to the building where his office was located, which Plaintiff believed was retaliation against her for disclosing the harassment. Plaintiff pleaded with Supervisor Hunter to wait until Defendant Malone arrived "so that he could sort things out," and Supervisor Hunter responded

that Plaintiff "could either get to work in Godwin's building or she was fired." (Am. Compl. [Doc. #30] ¶ 42.) After Plaintiff went to her assigned building, an EPA employee saw her crying and asked what was wrong. Plaintiff responded that "she was very afraid of Godwin and what he was going to do to her." (Am. Compl. [Doc. #30] ¶ 44.) She tried calling Defendant Malone to find out where her help was, but he did not answer or respond to her calls.

Plaintiff then called security dispatch, which sent two officers to talk to her. While discussing Defendant Godwin's harassment, she suffered a severe panic attack, lost consciousness, and was removed from the EPA premises by ambulance. The panic attack was debilitating, leaving Plaintiff unable to return to work and requiring Plaintiff to be placed on medical leave by her doctor. While on medical leave, Defendant Malone spoke to Plaintiff on several occasions, asking her to return to work.

On August 4, 2010, Plaintiff filed a charge of harassment with the Equal Employment Opportunity Commission and sought a protective order against Defendant Godwin. On August 17, 2010, Plaintiff met with Defendant Malone and his partner Kerry Johnson, who "promised [Plaintiff] that they would take care of her, [ ] that she could work in a separate building from Godwin and have no contact with him, and [that she could] use a separate time clock so she would not risk running into him." (Am. Compl. [Doc. #30] ¶ 51.)

Plaintiff received clearance from her doctor to return to work on September 22, 2010, and then wrote to Defendant Malone to tell him that she was ready to come back to work. Defendant Malone called Plaintiff on September 25, 2010, to let Plaintiff know that he needed everything from her in writing, including a doctor's note. On September 27, 2010, Defendant

Malone called Plaintiff to ask her whether she intended to seek renewal of the no-contact order against Defendant Godwin, and after she indicated that she would, Defendant Malone said he would see her at the proceeding. When Plaintiff sought renewal of the no-contact order in court the next day, Defendant Malone was present "to support [ ] and aid" Defendant Godwin in fighting the renewal of the order. (Am. Compl. [Doc. #30] ¶ 55.)

On October 3, 2010, Plaintiff went to her doctor's office for the paperwork that Defendant Malone requested, and the next day, faxed the doctor's note and called Defendant Malone to let him know she was ready to return to work. Defendant Malone and Supervisor Hunter then called Plaintiff at home, and Defendant Malone told her that "her complaints were a disruption of his business, and because of that[,] he was firing her." (Am. Compl. [Doc. #30] ¶ 58.) Plaintiff then filed a second EEOC charge on October 7, 2010, this time alleging retaliation based on her termination. Plaintiff eventually received "right to sue" letters regarding both of her charges, and "continues to suffer extensive psychological and emotional harm requiring medical attention, medication, and therapy." (Am. Compl. [Doc. #30] ¶¶ 60-63.)

On August 9, 2011, Plaintiff filed this action in Durham County Superior Court against Corporate Defendants, Defendant Godwin, Defendant Malone, Universal Management Group, Inc., Diversified Management Group, LLC, and Logistical Customer Service, Inc. Defendants removed the case on September 12, 2011. All Defendants filed motions to dismiss, and Plaintiff requested leave to amend her complaint, which the Court granted in part on August 23, 2012. (Order [Doc. #29].) Plaintiff then amended her complaint, which had the effect of dismissing all claims against Universal Management Group, Inc., Diversified Management Group, LLC, and

Logistical Customer Service, Inc., and adding a Title VII retaliation claim against Corporate Defendants.

Plaintiff's Amended Complaint [Doc. #30] asserts twelve claims under federal and state law. Plaintiff's federal claims consist of retaliation and sexual harassment in violation of Title VII of the Civil Rights Acts of 1964 ("Title VII") and denial of Plaintiff's Family Medical Leave Act rights. Plaintiff's state law claims consist of wrongful discharge in violation of North Carolina public policy, conspiracy to interfere with Plaintiff's civil rights as protected by N.C. General Statute § 99D-1, negligent hiring, negligent retention, negligent supervision, negligent infliction of emotional distress, intentional infliction of emotional distress, assault, and battery.

After Plaintiff filed her Amended Complaint [Doc. #30] on August 31, 2012, the remaining Defendants re-filed motions to dismiss that incorporate their earlier filed motions to dismiss and supporting memoranda. Before the Court now are Corporate Defendants and Defendant Godwin's Partial Motion to Dismiss [Doc. #33] and Defendant Malone's Motion to Dismiss [Doc. #32], filed pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.    STANDARD OF REVIEW

Both Motions to Dismiss are filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In reviewing a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Fourth Circuit has directed that "we 'take the facts in the light most favorable to the plaintiff,' but 'we need not accept the legal conclusions drawn from the facts,' and 'we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (quoting Eastern Shore Mkts., Inc. v. J.D. Assocs.

Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 556, 557, 127 S. Ct. at 1965, 1966) (internal quotation marks and citations omitted). Thus, dismissal of a complaint is a proper where plaintiff's factual allegations fail to "produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'" Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 256 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 683, 129 S. Ct. at 1952).

III.    DISCUSSION

For reasons discussed in detail below, Corporate Defendants' Partial Motion to Dismiss [Doc. #33] asks the Court to dismiss six of the twelve claims against them: (1) sexual harassment in violation of Title VII, (2) conspiracy to interfere with Plaintiff's civil rights in violation of N.C. General Statute § 99D-1, (3) negligent hiring, (4) intentional infliction of emotional distress,

(5) assault, and (6) battery. (Corp. Defs. & Def. Godwin's Partial Mot. to Dismiss [Doc. #33], at 2.)  In the same Partial Motion to Dismiss [Doc. #33], Defendant Godwin asks the Court to dismiss two of the six claims against him:  (1) sexual harassment in violation of Title VII and (2) conspiracy to interfere with Plaintiff's civil rights as protected by N.C. General Statute § 99D-1. Id.

Separately, in Defendant Malone's Memorandum in Support of his Motion to Dismiss [Doc. #18], incorporated into Defendant Malone's renewed Motion to Dismiss [Doc. #32], he asks the Court to dismiss all five claims against him: sexual harassment in violation of Title VII, wrongful discharge in violation of North Carolina public policy, conspiracy to interfere with Plaintiff's civil rights in violation of N.C. General Statute § 99D-1, negligent infliction of emotional distress, and intentional infliction of emotional distress.  (Def. Malone Mot. to Dismiss [Doc. #32], at 2.)  Specifically, he incorporates the legal arguments in Corporate Defendants and Defendant Godwin's Partial Motion to Dismiss [Doc. #33] with respect to three claims:[3] sexual harassment in violation of Title VII, conspiracy to interfere with Plaintiff's civil rights, and intentional infliction of emotional distress.  (Mem. in Support of Def. Malone Mot. to Dismiss [Doc. #18], at 12, 13-14, 15-16)  With respect to all claims against Defendant Malone (including wrongful discharge in violation of North Carolina public policy and negligent infliction of emotional distress, which are not challenged by Corporate Defendants or Defendant Godwin at this stage), Defendant Malone argues that Plaintiff's allegations are too vague to

_____

[3] Though Defendant Malone states he wishes to join in the Corporate Defendants and Defendant Godwin's Partial Motion to Dismiss also with respect to the claims of assault, battery, and negligent hiring (Mem. in Support of Def. Malone Mot. to Dismiss [Doc. #18], at 12), the Amended Complaint does not allege these claims against Defendant Malone.

create derivative liability, and that none of the Amended Complaint's specific allegations regarding Defendant Malone support any of the allegations against him. Id. at 3, 6-8.

Because diversity jurisdiction does not appear to be present here, Plaintiff's state law claims raised in this case come before the Court on the basis of supplemental jurisdiction, pursuant to 28 U.S.C. § 1367. Therefore, as all of the alleged conduct occurred in North Carolina, the Court must apply the applicable substantive law of North Carolina. See Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822, 82 L. Ed. 1188 (1938); Comm'r v. Estate of Bosch, 387 U.S. 456, 465, 87 S. Ct. 1776, 1782-83, 18 L. Ed. 2d 886 (1967). The Court will analyze each of the challenged claims in turn, beginning with those challenged by all Defendants.

1.    Title VII Hostile Work Environment Claim

Corporate Defendants, Defendant Godwin, and by incorporation, Defendant Malone, make three arguments as to why Plaintiff's Title VII sexual harassment claim should fail. First, all Defendants argue that Plaintiff's claim fails because she did not allege in her complaint that she exhausted her administrative remedies, as required for successful Title VII claims. (Mem. in Support of Corp. Defs. & Def. Godwin's Partial Mot. to Dismiss [Doc. #16], at 8-9.) Second, Defendant Godwin and Defendant Malone contend that this claim fails against them because they were supervisors, and thus, not employers within the scope of Title VII liability. Id. at 9-10. Third, all Defendants argue that even if Plaintiff amended her Complaint to allege exhaustion, the claim still fails against Diversified Service Contracting, Ace Services, Defendant Godwin, and Defendant Malone, because the only entity named in Plaintiff's EEOC charges is DAS II. Id. at 9. The Court will consider each argument in turn.

a.      Requirement to Allege Exhaustion

Defendants first argue that Plaintiff's claim fails because she did not allege that she exhausted her administrative remedies.  (Mem. in Support of Corp. Defs. & Def. Godwin's Partial Mot. to Dismiss [Doc. #16], at 8-9; Def. Malone Mot. to Dismiss [Doc. #32], at 1.)  In order to make a successful Title VII claim, a complainant must exhaust her administrative remedies prior to filing an action in federal court.  Jones v. Calvert Grp, Ltd., 551 F.3d 297, 300 (4th Cir. 2009) ("[A] failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim.").  The first step is the filing of a charge of discrimination with the EEOC "by or on behalf of a person claiming to be aggrieved, or by a member of the Commission."  42 U.S.C. § 2000e-5(b) (2006).  Upon receiving a charge, the EEOC must provide notice of the charge to the employer, investigate the validity of the claim, and, if the claim proves valid, attempt to remedy the discrimination through "informal methods of conference, conciliation, and persuasion."  Id.  If these efforts fail and the EEOC elects not to bring a lawsuit against the employer, the employee receives notice of his right to sue and has ninety days to file a Title VII action.  Id. § 2000e–5(f)(1); Alexander v. City of Greensboro, 801 F. Supp. 2d 429, 436 (M.D.N.C. 2011).

Defendants are correct that a plaintiff bringing a Title VII claim must allege "receipt of, or at least entitlement to, a right-to-sue letter . . . in [the] complaint."  Davis v. N.C. Dep't of Corr., 48 F.3d 134, 140 (4th Cir. 1995) (citing United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979)).  However, after this argument was made in the initial motions to dismiss, Plaintiff sought and received leave to amend her complaint to allege exhaustion of her

11

claims. (Mot. to Amend [Doc. #22], Order [Doc. #29].) Plaintiff then amended her complaint to cure any defect in this regard. (Am. Compl. [Doc. #30] ¶¶ 49, 59-62). Therefore, this argument that Plaintiff failed to allege exhaustion is now moot.

> b.   Liability of a Supervisor

Defendant Godwin and Defendant Malone next argue that they are improper parties as to Plaintiff's Title VII sexual harassment claim, because they are supervisors and not employers under Title VII. As this Court noted in its prior Order [Doc. #29], individual supervisors are not liable for Title VII claims, unless they are otherwise an employer under Title VII. Lissau v. S. Food Serv., Inc., 159 F.3d 177, 180-81 (4th Cir. 1998).

Title VII defines the term "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . . ." 42 U.S.C. § 2000e(b) (2006). Defendant Godwin was Plaintiff's supervisor, and Plaintiff does not allege facts that would qualify him as an employer under Title VII. Indeed, Plaintiff does concede that Defendant Godwin is not an employer under Title VII. (Resp. Br. to Corp. Defs. & Def. Godwin's Partial Mot. to Dismiss [Doc. #24], at 12.). Therefore, the Court will dismiss the Title VII sexual harassment claim against Defendant Godwin.

However, Plaintiff contends that Defendant Malone is an employer under Title VII, because although he did serve a supervisory function, he is more than a mere supervisor. Plaintiff alleges that DAS II is a joint venture and that Defendant Malone "owns and/or manages [DAS II] and one or more of its parent companies" (Am. Compl. [Doc. #30] ¶¶ 5, 11.)

Plaintiff also alleges that Diversified Service Contracting and Ace Services are North Carolina corporations that are partners in DAS II, and wholly own and operate, or own a controlling interest, in DAS II. (Am. Compl. [Doc. #30] ¶¶ 6-7.)

Under North Carolina law, "'[a] joint [venture] is in the nature of a kind of partnership, and although a partnership and a joint [venture] are distinct relationships, they are governed by substantially the same rules.'" Jones v. Shoji, 110 N.C. App. 48, 51, 428 S.E.2d 865, 867 (1993), aff'd in part and disc. review improvidently allowed in part, 336 N.C. 581, 444 S.E.2d 203 (1994) (quoting Pike v. Trust Co., 274 N.C. 1, 9, 161 S.E.2d 453, 460 (1968)). With limited exceptions, all partners are jointly and severally liable for the acts and obligations of a partnership formed under North Carolina law. N.C. Gen. Stat. § 59-45(a) (2013). A joint venture operates similarly, in that the torts of one member of a joint venture may be imputed to another member of the same joint venture. Halifax Reg'l Med. Ctr., Inc. v. Brown, 743 S.E.2d 70, 72 (N.C. Ct. App. 2013) ("A joint venture is 'an alliance between two or more people in pursuit of a common purpose such that negligence of one participant may be imputed to another.'" (quoting Slaughter v. Slaughter, 93 N.C. App. 717, 720, 379 S.E.2d 98, 100 (1989)).

Therefore, Plaintiff's allegations about Defendant Malone owning DAS II and/or one or more of its parent companies, coupled with some of her factual allegations (such as Defendant Malone telling Plaintiff that "her complaints were a disruption of *his* business, and because of that he was firing her" (emphasis added)), supports a theory that Defendant Malone could be an employer under Title VII. If Defendant Malone is one of the owners of DAS II, a joint venture, then he may be personally liable for the obligations of the joint venture, just as

partners of a partnership are generally personally liable for the obligations of the partnership. If instead, the evidence shows that Defendant Malone owns one of the parent companies of DAS II, but not DAS II itself, he could still be treated as an employer under Title VII under an alter-ego theory, if he acted in such a way that would permit the Court to pierce the corporate veil. See Keffer v. H.K. Porter Co., 872 F.2d 60, 64 (4th Cir. 1989) ("Although decisions to pierce a corporate veil, exposing those behind the corporation to liability, must be taken reluctantly and cautiously, courts will not hesitate to take such action when justice so requires. Determining when 'justice so requires' necessitates a careful review of the circumstances of each case—a factual inquiry particularly within the province of the district court." (citations omitted)) (citing In re Cnty. Green Ltd. P'ship, 604 F.2d 289, 292 (4th Cir. 1979), DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 684 (4th Cir. 1976)); see also Mayes v. Moore, 419 F. Supp. 2d 775, 781 (M.D.N.C. 2006) ("A court can disregard the corporate form and impose [Title VII] liability, or pierce the veil of protection, under the alter-ego theory when (1) the shareholder dominates and controls the organization and (2) imposing such liability is needed to avoid injustice").

Though the extent of Defendant Malone's relationship with Corporate Defendants is unknown at this stage, Plaintiff has pled facts sufficient to allow this claim to proceed against Defendant Malone, even though he is an individual. If after discovery, the evidence instead shows that such treatment of Defendant Malone as an employer is inappropriate, then this claim against Defendant Malone would be subject to dismissal at that time. However, Plaintiff's Title VII claim against Defendant Godwin is dismissed, as Plaintiff does not allege him to be anything

more than a mere supervisor, and thus, he is not an employer under Title VII.

c.     Naming Requirement

Finally, Defendants contend that Plaintiff's claim fails against all Defendants except DAS II, because Plaintiff failed to adequately exhaust her administrative remedies by not specifically naming any employer other than DAS II in her EEOC charge, as required by Title VII. Plaintiff responds that her claim against the unnamed Defendants survives under the "substantial identity exception" to Title VII's naming requirement.

Generally, under Title VII, a civil action may be brought "only 'against the respondent named in the charge.'" Causey v. Balog, 162 F.3d 795, 800 (4th Cir. 1998) (quoting 42 U.S.C. § 2000e–5(f)(1) (1994)). "The naming requirement serves two purposes, and is not a mere technicality: 'First, it notifies the charged party of the asserted violation. Secondly, it brings the charged party before the EEOC and permits effectuation of the Act's primary goal, the securing of voluntary compliance with the law.'" Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll., 848 F.2d 457, 458-59 (4th Cir. 1988) (quoting Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 719 (7th Cir. 1969)).

However, the Fourth Circuit has also recognized that "Title VII does not require procedural exactness from lay complainants." Id. at 460. Indeed, "EEOC charges must be construed with utmost liberality since they are made by those unschooled in the technicalities of formal pleading." Id. (quoting Kaplan v. Int'l Alliance of Theatrical & Stage Employees, 525 F.2d 1354, 1359 (9th Cir. 1975), abrogated on other grounds by Laughon v. Int'l Alliance of Theatrical Stage Employees, 248 F.3d 931 (2001)). Specifically, the Fourth Circuit has allowed

Title VII claims to proceed against defendants unnamed in the EEOC charge where the unnamed defendant is identical to the named defendant for purposes of Title VII claims, and where the two purposes of Title VII (that is, notice and an opportunity for voluntary conciliation) are not thwarted.  Id.

Furthermore, district courts throughout the Fourth Circuit have recognized a "substantial identity" exception to Title VII's naming requirement where unnamed defendants are substantially identical, though not necessarily outright identical, to the named defendant.  E.g., Mayes v. Moore, 419 F. Supp. 2d 775, 782-83 (M.D.N.C. 2006); Mayo v. Questech, Inc., 727 F. Supp. 1007, 1010-12 (E.D. Va. 1989); Miceli v. KBRG of Statesville, LLC, No. 5:05cv265-v, 2010 WL 3527560, at *3-4 (W.D.N.C. Sept. 2, 2010); Little v. Stock Bldg. Supply, LLC, No. 4:10cv129-F, 2011 WL 5149176, at *3-4 (E.D.N.C. Sept. 2, 2011); Fontell v. McGEO UFCW LOCAL 1994, No. AW-09-2526, 2010 WL 3086498, at *5 (D. Md. Aug. 6, 2010).  While the Fourth Circuit has not affirmatively adopted this exception, it has commented favorably on it in dictum.  See Alvarado, 848 F.2d at 461 ("The Fourth Circuit has not had occasion to decide whether to adopt the substantial identity exception, but we note that language in Chastang was quoted with approval by this court in dictum: where there is substantial, if not complete identity of parties before the EEOC and the court, it would require an unnecessarily technical and restrictive reading of [the statute] to deny jurisdiction." (quoting EEOC v. Am. Nat'l Bank, 652 F.2d 1176, 1186 n.5 (4th Cir. 1981)) (internal quotation marks omitted)).

Under the substantial identity exception, courts generally consider four factors enumerated by the Third Circuit in Glus v. G.C. Murphy Company:

(1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;

(2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;

(3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; and

(4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

Mayes, 419 F. Supp. 2d at 783 (quoting Glus v. G.C. Murphy Co., 562 F.2d 880, 888 (3d Cir. 1977)); Mayo, 727 F. Supp. at 1011 (quoting Glus, 562 F.2d at 888). Courts have often emphasized the second and third factors as "the most important[,] as they are most reflective of the two-fold purpose of the naming requirement," that is, providing notice and an opportunity for voluntary conciliation. Fontell, 2010 WL 3086498, at *5 (quoting Crosten v. Kamauf, 932 F. Supp. 676, 682 (D. Md. 1996)); e.g., Mayo, 727 F. Supp. at 1011 (citing Alvarado, 848 F.2d at 460). This emphasis on Title VII's two-fold purpose is consistent with the Fourth Circuit's holding in Causey v. Balog that unnamed individual defendants may not be held personally liable where the EEOC charge at issue "failed to put the individual defendants on notice that they were potentially subject to personal liability for the alleged violations." 162 F.3d at 800-01.

Plaintiff filed her first charge of discrimination with the EEOC on August 4, 2010, against DAS II. (Ex. A [Doc. #16-1].) Though Plaintiff only named DAS II as her employer, she alleges in the text of the charge that she was sexually harassed by Defendant Godwin while

she was at work.  Id.  Specifically, the text of that charge briefly alleges the two attacks by Defendant Godwin, as well as Plaintiff's reporting of those incidents to Defendant Malone, Defendant Malone's corresponding failure to act on this information, and her later suspension. Id.  Plaintiff filed her second charge against DAS II with the EEOC on October 7, 2010.  (Ex. B [Doc. #16-2].)  Again, she only named DAS II as her employer, but in the text of the charge, she alleges the retaliation inflicted by Defendant Malone because of Plaintiff's complaints about sexual harassment.  Id.

Viewing the facts in the light most favorable to Plaintiff, the four factors weigh in favor of allowing her Title VII harassment claim to proceed against the remaining unnamed Defendants (Diversified Service Contracting, Ace Services, and Defendant Malone).  Starting with Diversified Service Contracting and Ace Services, Plaintiff alleges that the named Defendant, DAS II, is "a joint venture of Diversified Service Contracting, Inc. and Ace Services, Inc., and is an alter-ego of those two corporations."  (Am. Compl. [Doc. #30] ¶ 5.)  She also alleges that Diversified Service Contracting and Ace Services are each "a partner in [DAS II], and wholly own[ ] and operate[ ], or own[ ] a controlling interest in[ DAS II]," and that they each "ha[ve] a controlling interest and/or beneficial relationship with the entity known as DAS II." (Am. Compl. [Doc. #30] ¶¶ 6-8.)

As for the first of the four Glus factors enumerated by the Third Circuit, Plaintiff gives no indication that she knew or could have known of the relationship between Diversified Service Contracting, Ace Services, and DAS II when she filed her EEOC charge without the assistance of counsel.  As to the second factor, Plaintiff's allegations that these two corporations wholly

own and operate the joint venture named in her EEOC charge implies that their interests are likely similar enough that, for purposes of obtaining voluntary conciliation and compliance, it would be unnecessary to include them in the proceedings. For the same reason, as to the third factor, there does not appear to be any actual prejudice to the interests of these unnamed parties. Finally, as to the fourth factor, Plaintiff's allegation that she was told that she was an employee of DAS II, which is owned and operated by these two corporations, is an indication that these two unnamed Defendants, Diversified Service Contracting and Ace Services, represented to Plaintiff that their relationship with her was to be through DAS II.

Similarly, the facts alleged by Plaintiff also weigh in favor of allowing Plaintiff's Title VII harassment claim to proceed against unnamed Defendant Malone. Plaintiff alleges that prior to filing her August 4 EEOC charge, Defendant Malone was told by both Plaintiff's husband and Plaintiff of her allegations of harassment, and that Defendant Malone said he would help her but did nothing while retaliatory action was taken against her for speaking out about the harassment. (Am. Compl. [Doc. #30] ¶¶ 37-38, 41-42.) Plaintiff also alleges that she met with Defendant Malone on August 17, 2010, when he and his partner "promised [ ] that they would take care of her, promised that she could work in a separate building from [Defendant] Godwin and have no contact with him, and use a separate time clock so she would not risk running into him." (Am. Compl. [Doc. #30] ¶ 51.) Furthermore, Defendant Malone called Plaintiff on multiple occasions in September, discussed Plaintiff's attempted renewal of a protective order against Defendant Godwin, attended the protective order renewal hearing, and finally called her on October 7, 2010, to tell her that "her complaints were a disruption of *his* business," and that

he was therefore firing her.  (Am. Compl. [Doc. #30] ¶¶ 53-55, 58 (emphasis added).)

Though Plaintiff unquestionably knew Defendant Malone's identity when she filed both EEOC charges without the assistance of counsel, she did discuss Defendant Malone in the body of both charges.  (Ex. A [Doc. #16-1], at 1; Ex. B [Doc. #16-2], at 1.)  Furthermore, her allegations about her various discussions with him both before and after she filed her August 4 EEOC charge indicate that unnamed Defendant Malone had both notice of the charge and an opportunity to participate in voluntary conciliation efforts.  Indeed, it appears Defendant Malone actively participated in voluntary conciliation efforts through several conversations with Plaintiff and the meeting with her and his business partner.  Finally, Plaintiff's allegation that she was told by a DAS II agent that she was an employee of DAS II, which Plaintiff alleges is owned by Defendant Malone, is an indication that he or the other unnamed Defendants represented to Plaintiff that their relationship with her was to be through DAS II.

Therefore, at this stage, the Court will dismiss Plaintiff's Title VII sexual harassment claim against Defendant Godwin, but will allow it to proceed against all of the Corporate Defendants and Defendant Malone.  However, if after discovery the evidence shows that the substantial identity exception to the naming requirement should not apply to any of these Defendants, then this claim would be subject to dismissal against those Defendants.

2.      Conspiracy to Interfere with Civil Rights

Corporate Defendants, Defendant Godwin, and by incorporation, Defendant Malone contend that Plaintiff's claim of conspiracy to interfere with her civil rights in violation of N.C. General Statute § 99D-1 fails to state a claim upon which relief can be granted for two reasons.

First, they argue that § 99D-1 applies only to constitutional rights, and Plaintiff has failed to allege a constitutional right that Defendants conspired to interfere with. (Mem. in Support of Corp. Defs. & Def. Godwin's Partial Mot. to Dismiss [Doc. #16], at 6.) Second, they contend that the § 99D-1 claim fails because Plaintiff's allegations of a conspiracy are "conclusory legal conclusions devoid of any factual support." (Mem. in Support of Corp. Defs. & Def. Godwin's Partial Mot. to Dismiss [Doc. #16], at 7.)

Defendants appropriately assert the argument that § 99D-1 applies only to constitutional rights. N.C. General Statute § 99D-1(a) reads:

> It is a violation of this Chapter if:
>
> (1) Two or more persons, motivated by race, religion, ethnicity, or gender, but whether or not acting under color of law, conspire to interfere with the exercise or enjoyment by any other person or persons of a *right secured by the Constitutions of the United States or North Carolina*, or of a right secured by a law of the United States or North Carolina *that enforces, interprets, or impacts on a constitutional right*; and
>
> (2) One or more persons engaged in such a conspiracy use force, repeated harassment, violence, physical harm to persons or property, or direct or indirect threats of physical harm to persons or property to commit an act in furtherance of the object of the conspiracy; and
>
> (3) The commission of an act described in subdivision (2) interferes, or is an attempt to interfere, with the exercise or enjoyment of a right, described in subdivision (1), of another person.

N.C. Gen. Stat. § 99D-1(a) (2013) (emphasis added). In response to Defendants' argument, Plaintiff contends that she does allege a conspiracy to interfere with a constitutional right in her § 99D-1 claim. Plaintiff's Amended Complaint states that "Defendants conspired to interfere with the exercise or enjoyment by Plaintiff of her right to work and earn a living in an environment free of sexually abusive and discriminatory conduct, a right secured by the

Constitutions of the United States and/or North Carolina, or of a right secured by a law of the United States and/or North Carolina that enforces, interprets, or impacts on a constitutional right." (Am. Compl. [Doc. #30] ¶ 114.)

However, Plaintiff's Amended Complaint does not specify what constitutional provision effectuates this right that she has described. In Plaintiff's Response Brief, she points to Article I, § 1, of the North Carolina Constitution, which reads: "We hold it to be self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." (Resp. Br. to Corp. Defs. & Def. Godwin's Partial Mot. to Dismiss [Doc. #24], at 9 (quoting N.C. Const. art. I, § 1).) Plaintiff also cites N.C. General Statute § 143-422.2 as an example of a state law that enforces and interprets the constitutional rights described in Article I, § 1.

Section 143-422.2 is a legislative declaration passed by the North Carolina General Assembly in 1977 in order to provide the same protections under North Carolina law as federal law provides under Title VII. Leonard v. Wake Forest Univ., 877 F. Supp. 2d 369, 372 (M.D.N.C. 2012); see North Carolina Dep't of Corr. v. Gibson, 308 N.C. 131, 141, 301 S.E.2d 78, 85 (1983) ("The ultimate purpose of . . . [§] 143-422.2[ ] and Title VII [ ] is the same; that is, the elimination of discriminatory practices in employment."). Though Plaintiff asserts that § 143-422.2 as an example of a state law that enforces and interprets the constitutional rights described in Article I, § 1, Plaintiff does not cite any authority to support such an assertion.[3]

_____

[3] Although Plaintiff does not provide any support as to her assertion that § 143-422.2 is an appropriate basis for a conspiracy to interfere with civil rights claim because it enforces

Indeed, Plaintiff does not cite any case law to support her broader implication that Defendants' alleged conduct is recognized by North Carolina courts as a violation of Article I, § 1. Therefore, because Plaintiff does not identify any other potential constitutional right or any other statute that purportedly enforces a constitutional right, Plaintiff has not identified a constitutional right that Defendants allegedly conspired to interfere with.

However, Plaintiff has referenced an unpublished disposition in which the North Carolina Court of Appeals held that a trial court erred by dismissing a similar sexual harassment claim in the employment context. See Earp v. Quinlan, No. COA09-578, 206 N.C. App. 329, at *6-7 (Aug. 3, 2010) (describing the right at issue as plaintiff's "right to work and earn a living in an environment free of sexually oppressive conduct"). Furthermore, in a different opinion, the North Carolina Court of Appeals reversed a trial court's dismissal of a plaintiff's § 99D-1 claim where the amended complaint alleged that one defendant made drinks that rendered plaintiff physically helpless and later unconscious, plaintiff was then stripped naked and filmed, and later the defendants attempted to distance themselves from the resulting criminal investigation by destroying evidence and harassing plaintiff. Zenobile v. McKecuen, 144 N.C. App. 104, 110-11, 548 S.E.2d 756, 760 (2001) (holding that the alleged facts were sufficient to state a claim that the defendants acted "in furtherance of the common scheme to interfere with plaintiff's exercise and enjoyment of her civil rights *as a woman*" (emphasis added)).

––––––––––––––––––––––––

Article I, § 1 of the North Carolina Constitution, the Court notes that a violation of § 143-422.2 is a sufficient basis for Plaintiff's wrongful discharge claim, as discussed later. See Leonard, 877 F. Supp. 2d at 372 (citing McNeil v. Scotland Cnty., 213 F. Supp. 2d 559, 570 (M.D.N.C. 2002) ("While [§ 143-422.2] does not create a private right of action, a plaintiff can bring a common law claim for wrongful discharge based on a violation of the public policy expressed in [ ]§ 143–422.2." (citations omitted)).

In response, Defendants note that although both Earp and Zenobile allowed claims based on similar facts to proceed under § 99D-1, neither case presented the North Carolina Court of Appeals with the question of whether the claim fails because the conspiracy at issue did not interfere with any *constitutional* rights.  In fact, neither party identifies, and this Court has not found, any authority in which a North Carolina court has directly addressed Defendants' argument that Plaintiff's claim fails because she did not identify a specific constitutional right protected under the United States or North Carolina Constitutions.  Thus, absent a decision by a North Carolina court squarely addressing this question of state law, the Court will apply the prevailing law in North Carolina in the manner in which its highest state court would likely rule.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822, 82 L. Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."); Talkington v. Atria Reclamelucifers Fabrieken BV, 152 F.3d 254, 260 (4th Cir.1998) (holding that when state claims are evaluated in federal courts, the federal courts "are bound to apply governing state law, as interpreted by the relevant state's highest court," but "[i]f the law is not entirely clear, [federal courts] must rule as it appears the state court would rule" (citations omitted)).

In interpreting North Carolina statutes, the Supreme Court of North Carolina has described its primary task as "ensur[ing] that the purpose of the legislature, the legislative intent, is accomplished."  Elec. Supply Co. of Durham, Inc. v. Swain Elec. Co. Inc., 328 N.C. 651, 656, 403 S.E.2d 291, 294 (1991) (citing Hunt v. Reinsurance Facility, 302 N.C. 274, 288, 275 S.E.2d 399, 405 (1981)).  "Legislative purpose is first ascertained from the plain words of the statute."

Id. (citing Burgess v. Your House of Raleigh, 326 N.C. 205, 209, 388 S.E.2d 134, 136 (1990)). Defendants assert that the plain text of the statute limits a § 99D-1 violation to only those conspiracies that infringe upon rights protected by the United States or North Carolina Constitutions. Plaintiff does not dispute such a reading of § 99D-1. The Court agrees that the plain text of the statute unquestionably limits a § 99D-1 violation to only those conspiracies that infringe upon rights protected by the United States or North Carolina Constitutions. See N.C. Gen. Stat. § 99D-1(a)(1).

Therefore, because the plain text of § 99D-1 requires that the conspiracy at issue must have interfered with a constitutional right, and Plaintiff has not sufficiently identified a constitutional right of hers that Defendants conspired to interfere with, the Court will dismiss Plaintiff's § 99D-1 claim against all Defendants. Hence, the Court does not need to consider Defendants' second argument that Plaintiff's conspiracy allegations are conclusory legal conclusions without sufficient factual support.

3.      Intentional Infliction of Emotional Distress

Plaintiff raises a claim of intentional infliction of emotional distress ("IIED") against all Defendants. Defendant Godwin does not dispute that Plaintiff sufficiently pleads a claim of IIED against him, as the alleged harasser. However, Corporate Defendants and Defendant Malone contend that this claim against them fails under both theories asserted by Plaintiff: a theory of direct liability and a theory of vicarious liability.[3] Specifically, they contend that they

_____

[3] The Court notes that it is not entirely clear whether Plaintiff is contending that Defendant Malone is vicariously liable for IIED. Plaintiff's Amended Complaint attributes the "Respondeat Superior" section to "All Defendants" and attributes the IIED section to "All Defendants," in contrast with the assault and battery section, which is attributed only to

are not directly liable for Plaintiff's IIED claim, because their conduct was not extreme and outrageous, as required for a successful IIED claim. Because the vicarious liability analysis for IIED is identical to the vicarious liability analysis for other intentional torts at issue (assault and battery), the Court will consider the vicarious liability arguments separately after considering whether any Defendant other than Defendant Godwin could be directly liable for IIED.

Under North Carolina law, the elements of an IIED claim are "(1) extreme and outrageous conduct by the defendant (2) which is intended to and does in fact cause (3) severe emotional distress." Guthrie v. Conroy, 152 N.C. App. 15, 21, 567 S.E.2d 403, 408 (2002) (quoting Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992)). An IIED claim may also proceed where "[a] defendant's actions indicate a reckless indifference to the likelihood that [he] will cause severe emotional distress." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 488, 340 S.E.2d 116, 119-120 (1986) (quoting Dickens v. Puryear, 302 N.C. 437, 452-53, 276 S.E.2d 325, 335 (1981)).

Whether the conduct complained of in an IIED claim "may reasonably be found to be sufficiently outrageous as to permit recovery" is a question of law to be determined by the

---

Defendant Godwin and Corporate Defendants. However, Plaintiff does not address the argument that Defendant Malone is vicariously liable in her Response Brief to Defendant Malone's Motion to Dismiss [Doc. #25]. Defendant Malone did raise the argument that he is not vicariously liable, but only insofar as he incorporated the arguments from Corporate Defendants and Defendant Godwin's Memorandum in Support of their Partial Motion to Dismiss [Doc. #16]. Plaintiff did not respond to that argument in her Response to Defendant Malone's Motion to Dismiss [Doc. #25], but she did respond to it in her Response to Corporate Defendants and Defendant Godwin's Motion to Dismiss. (Resp. Br. to Corp. Defs. & Def. Godwin's Partial Mot. to Dismiss [Doc. #24], at 16-18.) Though far from a model of clarity, the Amended Complaint sufficiently alleges vicarious liability of Defendant Malone for IIED in such a way as to put him on notice of the potential claim.

Court.  Brown v. Burlington Indus., Inc., 93 N.C. App. 431, 436, 378 S.E.2d 232, 235 (1989) (quoting Hogan, 79 N.C. at 491, 340 S.E.2d at 121).  Once it is determined that the conduct could reasonably be found extreme and outrageous, only then does it go to the fact-finder to determine whether the conduct at issue is sufficiently extreme and outrageous to satisfy the IIED element.  Id.  This extreme and outrageous conduct element requires more than "mere insults, indignities, and threats."  Guthrie, 152 N.C. App. at 22, 567 S.E.2d at 409 (quoting Hogan, 79 N.C. App. at 493, 340 S.E.2d at 123).  "Conduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Foster v. Crandell, 181 N.C. App. 152, 168, 628 S.E.2d 526, 537 (2007) (quoting Johnson v. Colonial Life & Accident Ins. Co., 173 N.C. App. 365, 373, 618 S.E.2d 867, 872 (2005)).

Plaintiff's contention that Corporate Defendants and Defendant Malone are directly liable for IIED focuses on how these parties acted with reckless indifference and states that these actions directly and foreseeably led to Plaintiff's severe emotional distress.  However, to sufficiently plead an IIED claim, Plaintiff also has to state, with specificity, what conduct by a defendant is extreme and outrageous.  The only conduct by Corporate Defendants and Defendant Malone that Plaintiff cites as satisfying the extreme and outrageous element is that these Defendants "requir[ed] Plaintiff to continue to work with her abuser, threaten[ed] her, and fir[ed] her for reporting the abuse she had suffered." (Am. Compl. [Doc. #30] ¶ 138.)  Plaintiff only elaborates briefly in her Response Brief by claiming that these Defendants "creat[ed] an environment" in which the Plaintiff was sent back to work with, and in closer proximity to,

Defendant Godwin after reporting his sexual assaults against her. (Resp. Br. to Corp. Defs. & Def. Godwin's Partial Mot. to Dismiss [Doc. #24], at 18-19.) However, Plaintiff does not cite any authority as to why this particular conduct satisfies the extreme and outrageous element of her IIED claim.

Indeed, "North Carolina courts rarely 'find conduct in the employment context that will rise to the level of outrageousness necessary to support a claim of intentional infliction of emotional distress.'" Smith v. Computer Task Grp., Inc., 568 F. Supp. 2d 603, 621 (M.D.N.C. 2008) (quoting Thomas v. N. Telecom, Inc., 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000)); see Efird v. Riley, 342 F. Supp. 2d 413, 427 (M.D.N.C. 2004) ("North Carolina courts have been extremely reluctant to find actionable IIED claims in the employment context, and termination, allegedly in violation of federal law alone, does not necessarily constitute extreme and outrageous conduct under North Carolina law." (citing Jackson v. Blue Dolphin Commc'ns of N.C., LLC, 226 F. Supp. 2d 785, 794 (W.D.N.C. 2002)). When North Carolina courts have held conduct in the employment context to be "extreme or outrageous," the conduct at issue tends to be that of the defendant who directly harassed the plaintiff. E.g., Brown, 93 N.C. App. at 432, 435-36, 378 S.E.2d at 233, 234-35 (holding that the alleged conduct by supervisor could reasonably be found to be extreme and outrageous when he made sexually explicit remarks and gestures two to three times a week over an extended period of time); Hogan, 79 N.C. App. at 491, 340 S.E.2d at 121 (holding that the alleged conduct by supervisor could reasonably be found to be extreme and outrageous when he engaged in unwanted sexual touching of plaintiff, screamed profanities at her when she refused his advances, threatened her with bodily injury, and pulled a knife on

her). While Corporate Defendants' and Defendant Malone's conduct is unacceptable as alleged, such conduct fails to rise to the level of "extreme and outrageous" under North Carolina law. See, e.g., Efird, 342 F. Supp. 2d at 427 (holding that an alleged "campaign of sexual harassment" followed by discharge in retaliation for complaining about the sexual harassment was not extreme and outrageous); Thomas, 157 F. Supp. at 635-36 (holding that creation of a hostile work environment and discharge in retaliation for exercising Title VII rights, among other conduct, was not extreme and outrageous as required for IIED under North Carolina law); Hogan, 79 N.C. App. at 493-94, 340 S.E.2d at 122-23 (holding that conduct by co-employee was not extreme or outrageous when he screamed and shouted at plaintiff, called her names, and threw menus at her).

Therefore, because the Court finds that Plaintiff does not allege conduct by Corporate Defendants or Defendant Malone which may reasonably be found to be sufficiently extreme or outrageous as to permit recovery, the Court will dismiss Plaintiff's claim that Corporate Defendants and Defendant Malone are directly liable for IIED.

4. Vicarious Liability for Intentional Infliction of Emotional Distress, Assault, and Battery

Though the Court finds that Corporate Defendants and Defendant Malone are not directly liable for IIED, Plaintiff contends that Corporate Defendants and Defendant Malone are nonetheless still liable for IIED under a theory of respondeat superior. Specifically, Plaintiff contends that these Defendants are vicariously liable for two reasons: (1) because the actions were committed within the scope of Defendant Godwin's employment, and (2) because these Defendants ratified Defendant Godwin's conduct. In addition, Plaintiff contends that

Corporate Defendants (but not Defendant Malone) are also vicariously liable for assault and battery. Because none of the parties have alleged that Plaintiff has failed to state a claim of IIED, assault, and battery as to her alleged harasser, Defendant Godwin, it appears to the Court that the underlying tortious conduct has been sufficiently pled against Defendant Godwin. Therefore, the Court will focus on whether Plaintiff has sufficiently alleged vicarious liability of Corporate Defendants and Defendant Malone as to the IIED claim, and of Corporate Defendants alone for the assault and battery claims based upon Defendant Godwin's conduct (which, as stated above, has not been challenged).

An employer may be liable for an employee's tortious conduct under a respondeat superior theory in three situations: (1) when the employee's act is expressly authorized by the employer; (2) when the employee's act is committed within the scope of his employment and in furtherance of the employer's business; or (3) when the employee's act is ratified by the employer. Stanley v. Brooks, 112 N.C. App. 609, 613, 436 S.E.2d 272, 274 (1993) (citing Medlin v. Bass, 327 N.C. 587, 592, 398 S.E.2d 460, 463 (1990)). Plaintiff contends that two of these three situations apply to make these Defendants all vicariously liable for Defendant Godwin's IIED, and Corporate Defendants vicariously liable for Defendant Godwin's assault and battery: first, because Defendant Godwin was acting within the scope of his employment and in furtherance of the employer's business, and second, because his actions were ratified by the other Defendants.

In determining whether an employee's act was committed in the scope of employment and in furtherance of the employer's business, the Court must determine whether the act

complained of was "a means or method of doing that which the employee was employed to do." Phelps v. Vassey, 113 N.C. App. 132, 135, 437 S.E.2d 692, 694 (1993) (quoting Hogan, 79 N.C. App. at 491, 340 S.E.2d at 122). However, "if the employee departed, however briefly, from his duties in order to accomplish a purpose of his own," then the complained of act was not within the scope of employment, and the employer is not vicariously liable for the employee's torts. Id. at 135, 437 S.E.2d at 694-95. Furthermore, "[i]ntentional tortious acts are rarely considered to be within the scope of an employee's employment." Medlin, 327 N.C. at 594, 398 S.E.2d at 464 (1990) (quoting Brown, 93 N.C. App. at 437, 378 S.E.2d at 235). Specifically, if the intentional tort is committed, not as a means or for the purpose of performing the work the employee was employed to do, but instead "in a spirit of vindictiveness or to gratify his personal animosity or to carry out an independent purpose of his own, then the [employer] is not liable." Id. (quoting Robinson v. McAlhaney, 214 N.C. 180, 183, 198 S.E. 647, 650 (1938)).

Even though Defendant Godwin's alleged tortious conduct was committed while both he and Plaintiff were working, Plaintiff has not pointed to (and the Court has not found any) facts sufficient to support the contention that Defendant Godwin was acting within the scope of his employment or in the furtherance of any purpose of business purpose for his employer in committing the acts of harassment. Plaintiff does not allege, for example, that Defendant Godwin carried out these intentional tortious acts of sexually assaulting and threatening Plaintiff in an effort to accomplish his supervisory tasks or to increase her productivity at her job. Rather, it seems clear that the matters alleged fall into the category of intentional tortious acts designed to carry out Defendant Godwin's own independent purpose, and thus, they were not

within the course and scope of his employment. Though he was exercising authority conferred upon him by his employer when he summoned and spoke to Plaintiff, he was advancing a completely personal objective when he engaged in a sexual assault upon her. Because these actions could not conceivably advance any legitimate purpose of Defendant Godwin's employer, his acts were beyond the scope of his employment as a matter of law.

However, Plaintiff also contends that vicarious liability attaches due to ratification of Defendant Godwin's tortious acts. To establish that an employer ratified a tortious act by an employee, Plaintiff must show that the employer "had knowledge of all material facts and circumstances relative to the wrongful act, and that the employer, by words or conduct, show[ed] an intention to ratify the act." Hogan, 79 N.C. App. at 492, 340 S.E.2d at 122. Defendant Malone's responsibilities as manager and potentially as an owner involved supervising critical aspects of DAS II's business, as well as some level of supervision over Defendant Godwin and Plaintiff. At a minimum, he was vested with authority to act on behalf of Corporate Defendants with the power to address employee problems and fire employees.

Therefore, if Defendant Malone, as Plaintiff alleges, ignored several conversations with Plaintiff in which she described the harassment and attacks she endured, involved himself in Plaintiff's no-contact order court proceedings against Defendant Godwin, and ultimately fired her because her complaints "were a disruption of his business," then such conduct is sufficient to support a claim that Defendant Malone ratified Defendant Godwin's tortious conduct, if the evidence shows that he qualifies as Plaintiff's employer. Furthermore, even if Defendant Malone turns out to be an improper party in that he was a manager with no ownership over any of the

potential entities that employed Plaintiff, Defendant Malone's ratification would be imputed to whichever Corporate Defendant is properly deemed Plaintiff's employer, in light of his managerial status. See Hogan, 79 N.C. App. at 492, 340 S.E.2d at 122 ("The designation 'manager' implies general power and permits a reasonable inference that he was vested with the general conduct and control of defendant's business . . . , and his acts are, when committed in the line of his duty and in the scope of his employment, those of the company." (quoting Gillis v. Tea Co., 223 N.C. 470, 474, 27 S.E.2d 283, 285 (1943))).

Corporate Defendants, and Defendant Malone by incorporation, also argue that the Court should not allow this claim to proceed on a ratification basis, because ratification is a new theory not pled in Plaintiff's Amended Complaint. (Reply Br. by Corp. Defs. & Def. Godwin [Doc. #26], at 9.) However, Plaintiff does assert that these Defendants are vicariously liable for Defendant Godwin's intentional torts in a separate section entitled "Respondeat Superior" in her Amended Complaint, and it is well established under North Carolina law that ratification is one of three ways in which an employer may be vicariously liable for an employee's actions under a theory of respondeat superior. See Stanley, 112 N.C. App. at 613, 436 S.E.2d at 274; Medlin, 327 N.C. at 592, 398 S.E.2d at 463. In addition, Plaintiff incorporated the facts alleged into the Respondeat Superior section, and by doing so, incorporated facts sufficient to support vicarious liability under a theory of ratification. Therefore, contrary to Corporate Defendants and Defendant Malone's contention, Plaintiff has adequately pled that these Defendants are vicariously liable under a theory of ratification.

Therefore, Plaintiff's claim of vicarious liability for IIED against Corporate Defendants

and Defendant Malone, and Plaintiff's claim of vicarious liability for assault and battery against Corporate Defendants, may proceed on the basis of ratification alone.

5.    Negligent Hiring

Corporate Defendants contend that Plaintiff's Amended Complaint fails to allege negligent hiring, because Plaintiff does not allege that Defendant Godwin had any dangerous propensities that should have or could have been discovered at the time of his hiring.  Plaintiff responds that her allegations are made "to the best of her knowledge given that she has not had the opportunity to conduct discovery, without which she is handicapped in her ability to state with certainty when exactly each Defendant became aware of Defendant Godwin's tendencies to harass and abuse female employees."  (Resp. Br. to Corp. Defs. & Def. Godwin's Partial Mot. to Dismiss [Doc. #24], at 13-14.)

The elements of a claim for negligent hiring under North Carolina law are "(1) a specific tortious act by the employee; (2) the employee's incompetence or unfitness; (3) the employer's *actual or constructive notice of the employee's incompetency or unfitness*; and (4) injury resulting from the employee's incompetency or unfitness."  White v. Consol. Planning, Inc., 166 N.C. App. 283, 292, 603 S.E.2d 147, 154 (2004) (emphasis added) (citing Medlin, 327 N.C. at 591, 398 S.E.2d at 462).  The notice element requires that Plaintiff allege that Corporate Defendants knew or should have known about Defendant Godwin's dangerous propensities prior to hiring.  See Medlin, 327 N.C. at 592, 398 S.E.2d at 463 (dismissing plaintiff's negligent hiring claim because the record was "devoid of evidence that [employer defendants] knew or reasonably could have known of [employee defendant's] alleged pedophilic tendencies prior to the incident that is the

subject of this lawsuit"); <u>Stanley</u>, 112 N.C. App. at 612, 436 S.E.2d at 274 (holding that the forecast of evidence failed to show that defendant employer knew or should have known of the employee's criminal history prior to the incident with plaintiff, where defendant employer had no actual or constructive knowledge of employee's criminal past and there was no evidence suggesting that defendant employer did not exercise due care in hiring the employee).

Plaintiff identifies two paragraphs[5] in her Amended Complaint in which she states she "does allege that Defendants knew or should have known of Defendant Godwin's proclivities prior to hiring him." (Resp. Br. to Corp. Defs. & Def. Godwin's Partial Mot. to Dismiss [Doc. #24], at 13.) The first paragraph cited reads, "Defendants DAS had an obligation to [their] employees and staff to scrutinize [their] managerial staff prior to and subsequent to hiring, so as not to put persons with histories and propensities for abuse in positions of control." (Am. Compl. [Doc. #30] ¶ 121.) The second paragraph cited reads, "In failing to take adequate precautions to prevent the wrongful acts herein described, Defendants DAS breached [their] duty to Plaintiff, among others." (Am. Compl. [Doc. #30] ¶ 126.)

Corporate Defendants appropriately assert that Plaintiff failed to allege that Defendant Godwin had any dangerous propensities that should have or could have been discovered at the time of hiring. Nowhere in these two paragraphs cited by Plaintiff—or anywhere in her claim for negligent hiring—does she state what Corporate Defendants should have been able to identify about Defendant Godwin prior to hiring him. While Plaintiff persuasively identifies the

---

[5] Plaintiff identified these two paragraphs before she amended her complaint. Therefore, these paragraphs discussed are the corresponding paragraphs from the Amended Complaint, which are identical to those cited by Plaintiff from the original Complaint (paragraphs 110 and 115).

difficulty inherent in pleading negligent hiring before discovery commences, Plaintiff does not even allege in the most general terms that there was some indication of Defendant Godwin's dangerous proclivities that Corporate Defendants should have identified prior to hiring him. Without actual or constructive notice, Plaintiff's negligent hiring claim will fail, and because her Amended Complaint does not allege that Corporate Defendants had notice in any form prior to hiring Defendant Godwin, Plaintiff's allegations are insufficient to state a claim upon which relief may be granted. Therefore, the Court will grant Corporate Defendants' Motion on this matter and dismiss Plaintiff's negligent hiring claim.

      6.      Wrongful Discharge

Defendant Malone alone contends that Plaintiff's claim against him for wrongful discharge in violation of public policy should be dismissed, because there is no individual liability for wrongful discharge. Plaintiff responds that Defendant Malone is a proper party, insofar as he qualifies as an employer in the wrongful discharge context under North Carolina law.

"North Carolina is an employment-at-will state." Kurtzman v. Applied Analytical Indus., 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997). However, the North Carolina Supreme Court recognizes a public policy exception to the employment-at-will doctrine. Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 570, 515 S.E.2d 438, 440 (1999) (citing Coman v. Thomas Mfg. Co., 325 N.C. 172, 175, 381 S.E.2d 445, 447 (1989)). Upon suffering a violation of an express policy declaration contained in the North Carolina General Statutes, an individual can bring a wrongful discharge claim under this public policy exception. Amos v. Oakdale Knitting Co., 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992).

Plaintiff claims she was wrongfully discharged in violation of N.C. General Statute § 143-422.2, which states:

> It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

> It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

N.C. Gen. Stat. § 143-422.2 (2013). § 143-422.2 may form the basis for a wrongful discharge claim. See, e.g., Simmons v. Chemol Corp., 137 N.C. App. 319, 322, 324, 528 S.E.2d 368, 370, 371 (2000) (affirming summary judgment in favor of defendant while recognizing the cognizability of a wrongful discharge claim based on a violation of § 143-422.2); McLean v. Patten Cmty., Inc., 332 F.3d 714, 720-21 (4th Cir. 2003) (reinforcing prior holdings that a violation of § 143-422.2 may be the basis for a wrongful discharge claim).

Defendant Malone argues that this claim against him should be dismissed because "[a] supervisor, manager, or owner is not an employer and thus does not face liability for a common-law wrongful discharge claim." (Mem. in Support of Def. Malone Mot. to Dismiss [Doc. #18], at 14-15.) As previously discussed, Plaintiff has alleged facts that potentially could support treating Defendant Malone as an employer in the Title VII context, and therefore the Court allowed the Title VII claim against Defendant Malone to proceed at this stage. Similarly, Plaintiff has alleged facts sufficient to support a conclusion that Defendant Malone could be treated as an employer in the wrongful discharge context. North Carolina courts have allowed

wrongful discharge claims to proceed against supervisory and owner defendants. E.g., Amos, 331 N.C. at 350, 354, 416 S.E.2d at 168, 170; Phillips v. Gray, 163 N.C. App. 52, 53, 57, 592 S.E.2d 229, 233 (2004); see also Townsend v. Shook, 323 F. App'x 245, 251 (4th Cir. 2009) (reversing a district court opinion dismissing an individual defendant in a wrongful discharge claim, holding that the individual defendant may be sued as plaintiff's employer where that defendant had the exclusive right under North Carolina law to hire, discharge, and supervise the employees in his office).

While Defendant Malone appropriately asserts that the North Carolina cases cited by Plaintiff allow claims against individual defendants to proceed without addressing whether or not they are improper parties, Defendant Malone does not offer any North Carolina statutes or authority by North Carolina state courts to counter the implication underlying these opinions that there are circumstances in which an individual defendant can be treated as an employer for purposes of wrongful discharge.[6] Therefore, the Court will allow Plaintiff's wrongful discharge claim against Defendant Malone to proceed.

---

[6] Defendant Malone cites two federal district court cases to support his contention that he should not be treated as an employer in Plaintiff's wrongful discharge claim: Hooper v. North Carolina, 379 F. Supp. 2d 804 (M.D.N.C. 2005) and Iglesias v. Wolford, 539 F. Supp. 2d 831 (E.D.N.C. 2008). However, both of these cases involved individual defendants who were mere supervisors—neither of these cases involved a defendant who was also alleged to be an owner of the entity for which Plaintiff was told she worked, as Plaintiff has alleged in this case. While Defendant Malone argues that an individual who does not qualify as an employer does not face liability for a wrongful discharge claim, Defendant has not provided the Court with any authority or argument as to why he, as an alleged owner of DAS II, should not be treated as an employer in this context.

7.      Negligent Infliction of Emotional Distress

Defendant Malone argues that he is not liable for negligent infliction of emotional distress ("NIED") because he did not have a "personal legal duty to ensure that no individuals at that location engage in tortious behavior," as would be required for Plaintiff to state claim of NIED against him. (Mem. in Support of Def. Malone Mot. to Dismiss [Doc. #18], at 17.) Plaintiff responds that Defendant Malone did have a duty to protect her from Defendant Godwin "while the two were under [Defendant Malone's] supervision and control, particularly after he was made aware of Defendant Godwin's sexual harassment of Plaintiff." (Resp. Br. to Def. Malone's Mot. to Dismiss [Doc. #25], at 19.) Furthermore, Plaintiff contends that Defendant Malone "breached that duty by sending Plaintiff to work without any protections, by failing to inform Plaintiff of his actions, if any, to prevent further contact with her assailant, and by failing to notify other employees or EPA personnel that Godwin posed a threat to Plaintiff and should not be left alone with her." (Resp. Br. to Def. Malone's Mot. to Dismiss [Doc. #25], at 20.)

To state a claim for NIED under North Carolina law, "a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress [ ], and (3) the conduct did in fact cause the plaintiff severe emotional distress." Johnson v. Ruark Obstetrics and Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). The first NIED element requires that Plaintiff allege that the "defendant failed to exercise due care in the performance of some legal duty owed to [the] plaintiff under the circumstances[.]" Guthrie, 152 N.C. App. at 25, 567 S.E.2d at 410-11.

Plaintiff alleges that Defendant Malone, "had a duty not to engage in, or permit in the workplace, offensive conduct including but not limited to verbal, physical, psychological, and sexual abuse." (Am. Compl. [Doc. #30] ¶ 130.) She then alleges that Defendant Malone breached that duty by "committing these and other acts of wrongdoing" and "by failing to adequately monitor or control the workplace environment to keep it free from these and other offensive acts." (Am. Compl. [Doc. #30] ¶ 131.) The only basis that Defendant Malone offers as to why this claim fails against him is his argument that a non-employer does not have a legal duty to ensure that individuals at a location do not engage in tortious behavior.

In raising this argument, Defendant Malone asserts that he cannot be an employer in this context, without citing any authority to support such an assumption. In, addition, Defendant Malone does not cite any authority to support his argument that a non-employer cannot possess the legal duty described by Plaintiff in her Amended Complaint. As previously discussed, Plaintiff has alleged facts that, if true, may render it appropriate to treat Defendant Malone as her employer in the context of other claims. Indeed, Defendant Malone concedes that an employer "may well have a legal duty to appropriately supervise its agents." (Mem. in Support of Def. Malone Mot. to Dismiss [Doc. #18], at 17.) Therefore, because Defendant Malone perhaps could appropriately be treated as an employer in other legal contexts in this case, and he does not explain why the Court should not treat him as an employer in the NIED context, the Court finds that Defendant Malone has not sufficiently negated the allegations that form the basis of Plaintiff's NIED claim. Therefore, the Court will allow the NIED claim to proceed

against Defendant Malone.

IV.     CONCLUSION

Based on the foregoing, IT IS ORDERED that Corporate Defendants and Defendant Godwin's Partial Motion to Dismiss [Doc. #33] is GRANTED IN PART and DENIED IN PART.  Specifically, as to Corporate Defendants, IT IS ORDERED that the Motion is GRANTED as to Plaintiff's claim of negligent hiring and as to Plaintiff's claim that Corporate Defendants are directly liable for intentional infliction of emotional distress.  However, as to Corporate Defendants, IT IS ORDERED that the Motion is DENIED as to Plaintiff's Title VII harassment claim and as to Plaintiff's claims that Corporate Defendants are vicariously liable for intentional infliction of emotional distress, assault, and battery.

IT IS FURTHER ORDERED, as to Defendant Godwin, that the Partial Motion to Dismiss [Doc. #33] is GRANTED as to Plaintiff's claim of Title VII harassment claim and as to Plaintiff's claim of conspiracy to interfere with civil rights.

Finally, IT IS ORDERED that Defendant Malone's Motion to Dismiss [Doc. #32] is GRANTED IN PART and DENIED IN PART.  Specifically, as to Defendant Malone, IT IS ORDERED that his Motion is GRANTED as to Plaintiff's claim of conspiracy to interfere with civil rights and Plaintiff's claim that Defendant Malone is directly liable for intentional infliction of emotional distress.  However, as to Defendant Malone, IT IS ORDERED for the reasons stated herein that his Motion is DENIED as to Plaintiff's Title VII harassment claim, as to Plaintiff's claim of wrongful discharge, Plaintiff's claim of negligent infliction of emotional distress, and Plaintiff's claim that Defendant Malone is vicariously liable for intentional infliction

of emotional distress.

This the 7th day of February, 2014.

_James A. Beaty_
United States District Judge